46 C.C.P.A. (Patents)

### Application of Hans FLEISSNER.
### Patent Appeal No. 6401.

United States Court of Customs and Patent Appeals.
Feb. 11, 1959.
As Corrected April 22, 1959.

898

Richard E. Babcock, Jr., and Watson, Cole, Grindle & Watson, Washington, D. C., for appellant.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Acting Chief Judge, and RICH, MARTIN, and JOHNSON (retired), Judges.

MARTIN, Judge.

This appeal is from the decision of the Board of Appeals of the United States Patent Office affirming the Examiner's rejection of claims 7–10 of appellant's application for patent for improvements in a "Sieve Drum Drying Machine." Counsel for appellant withdrew the appeal as to claim 10 at the oral argument and the appeal accordingly is dismissed as to that claim.

Claim 7 is illustrative of the claims on appeal and reads as follows:

"7. A drying machine for drying fibre material, fabrics and the like, comprising a drying chamber, two groups of sieve drums arranged the one above the other and within said drying chamber to cause a layer of the material to be dried to pass from a drum of one group to a drum of the other group, an air heating device arranged within said drying chamber, means to conduct drying air through said heating device for heating the air, and from there through the material to be dried and the drums from the outside of the drums into the interior, and means to cause the drying air to pass from the heating device through the said layer of the material to be dried on the one group of drums peripherally into and out of the drums through the jackets of said drums into their interior and from there through the layer of the material to be dried on the other group of drums into their interior and finally from there axially to the heating device to be reheated."

The appealed claims are directed to an apparatus for drying fibrous material comprising an enclosed drying chamber having two groups of rotatably mounted perforated drums, one group above the other, with the respective members of said groups arranged in staggered relationship. A web of the material to be dried is interwoven between the upper and lower drums, passing alternately over the perforated peripheral surfaces of members of each of said groups of drums. Means are provided dividing the drying chamber into upper and lower sections, each section containing one set of the hollow drums. Each member of the lower group contains an axially mounted fan which causes air to pass over an external heater element, through the web of drying material on the upper drums and radially into the interior thereof, thence outwardly, axially through an appropriate duct, or radially through the perforated lower portions of said drums, to the lower section of the drying chamber. The fans then draw the air radially through the drying material and perforations on the lower drums into their interior, and axially recirculate the air to the heater element. It is noted that the drying air passes through the web material twice before being reheated and recycled.

The sole reference relied on is:

British Patent 336,540 Oct.16, 1930.

The British patent relates to a multiple drum drier of the same general type as that disclosed herein, comprising an enclosed drying chamber in which are contained upper and lower groups of rotatable staggered sieve drums. The material to be dried is passed in web form around alternate upper and lower drums through the chamber. Each drum contains an axially mounted fan which radially draws air into the drum interior

through the material to be dried and re-circulates the air axially to the next adjacent drum in each respective group. Heater elements adjacent each group of drums reheat the drying air as it passes in series flow. The patent discloses that the drying air is

" * * * distributed, as uniformly as possible, in the drying chamber * * *. This is an important feature inasmuch as the drums must be uniformly charged with air and eddies and transverse currents of air in the chamber must be avoided."

The Board of Appeals affirmed the Examiner's rejection of claims 7–9 as fully met by the British patent.

Counsel for the Patent Office concedes that the device disclosed " * * * differs structurally from the reference drier in the manner asserted * * * " by appellant, but contends that the claims on appeal do not define that distinction structurally. The solicitor points out that the board experienced " * * * considerable difficulty in applying the terminology of these claims either to the application disclosure or the reference disclosure particularly with regard to the path of circulation of drying air between the heater and drying drums." The board then came to the conclusion that "to the extent that such terminology understandably amplifies the structure positively recited, we consider these claims to apply to the reference disclosure in the same sense as to the application disclosure." The sole issue before us, therefore, is whether the claims on appeal define a patentable structural distinction over the British patent.

We do not agree with the board that patentable distinction has not been drawn between the recited apparatus of claim 7 and the reference drier, especially when the functional limitations of that claim are neither directly set forth nor reasonably suggested by the prior art of record. The basic modes of operation of the devices are distinguishable in that applicant discloses a chamber wherein drying air flows in series from the upper to the lower group of drying drums, whereas the chamber of the reference patent is so constructed that the air circulates independently within the upper and lower groups of drums.

Turning now to the claims on appeal, claim 7 defines a machine comprising "a drying chamber, two groups of sieve drums * * *, an air heating device * * *, means to conduct drying air * * *," suitably arranged in a particular manner to facilitate circulation of the air through each drum. These elements find response in the British patent. However, the claim continues:

" * * * means to cause the drying air to pass from the heating device through * * * the material * * * on the one group of drums * * * and from there through the * * * material * * * on the other group of drums * * *."

Those means are disclosed to include " * * * portions of the upper drums neighbouring the lower section * * * of the chamber * * * without covering sheets * * * " so located that:

"One portion of the drying air may enter the lower section of the chamber U directly over the respective segments of the upper drums."

Furthermore, axial ducts are provided in the upper drums which cause air to pass therefrom to the lower drums.

In contrast thereto, it is noted that, in addition to the portion of the British patent previously quoted, claim 3 of that reference recites that:

" * * * * the air * * * is * * * distributed as uniformly as possible, substantially one half above the upper series of drums and the other half underneath the lower series of drums, into a chamber, after having passed heating bodies, whereby the suction surfaces of the drum are uniformly supplied with air and eddies and transverse movements of the air in the chamber are prevented." (Emphasis added.)

Furthermore, the patentee makes specific provisions to prevent air flow from the upper to the lower series of drums, including covering means blocking the uncovered portions of the upper drums.

■ "It is ordinarily true that the omission of an element and its function is uninventive." In re Perrine, 111 F.2d 177, 178, 27 C.C.P.A. 1127. However, as a corollary thereto, it may be unobvious to omit an element while retaining its function. In re Anthony, 147 F.2d 695, 32 C.C.P.A. 868. In the instant case, the omission of covering means creating independent air flow in each group of drums accomplishes the omission of fans from one group of drums *without* omission of the function of those fans. Furthermore, the air pressure differential produced by appellant's fans draws the drying air through the moist fibrous material twice before being reheated, a manner of operation altogether foreign to the teachings of the reference patent. The pertinent claim recitation in this connection is:

> " * * * means to cause the drying air to pass from the heating device through *material* to be dried on *one* group of drums *peripherally into* and *out of* the *drums* through the *jackets* of *said* drums into their interior * * * and from there through the layer of *material* to be dried on the other group of *drums* into their interior and finally from there *axially* to the heating device to be reheated." (Emphasis added.)

It will be noted that the air flows into and out of the one (upper) group of drums peripherally through their jackets. The air then flows through the material on the other (lower) group of drums into their interior, such passage necessarily being through the periphery of those drums. The use of the word *"axially"* with reference to the outflow of air from the "other group of drums," taken in conjunction with the recitation pertaining to air passage "pheripherally into and out of the [upper group of] drums * * *" accentuates the distinction between the means by which the air flows from the first group and the means by which it flows from the second group.

■ However, the Patent Office Solicitor contends that the recitation of "means to cause * * * air to pass * * * peripherally into and *out of the drums * * * into their interior * * * "* (Emphasis ours) would appear to find no response in appellant's drier. Counsel argues that it is an obvious impossibility for air to circulate in the underscored manner and that no means can be found to accomplish such function. There was, however, no rejection of the claims on appeal as failing to particularly point out and distinctly claim the alleged invention, but rather only a rejection predicated on the British patent as an anticipation. To reject these claims as indefinite, we would be compelled to raise a ground of rejection not of record, and thus act beyond our statutory authority. In re Heltzer, 189 F.2d 971, 38 C.C.P.A. 1124. Nevertheless, it would not be amiss for appellant to clarify the claim in certain particulars.

■ Moreover, the words "into their interior" can only be reasonably interpreted to modify the air passage "peripherally into * * * the drums * * * "* and not to relate to air flow from one group of drums to the other. That the air passes through " * * * the jackets of said drums into their interior * * * "* in no way detracts from the recitation of "means * * * to cause * * * air to pass * * * peripherally into and out of the [said] drums * * * "* to the other group of drums.

Since the British patent contains no disclosure of the last mentioned means or its equivalents, and since we find that that means, when construed in the light of appellant's specification, produces a new mode of operation productive of results unexpected from a consideration of the teachings of the prior art, we shall reverse the rejection of claim 7. Since claims 8 and 9 depend from claim 7, we believe, for the reasons set out above,

that the rejection of those claims should also be reversed.

Reversed.

WORLEY, Judge (dissenting).

In my opinion the record supports the decision appealed from.   I would affirm.

46 C.C.P.A. (Patents).
**Application of Robert TOUVAY and Philippe Tommy Martin (Societe Anonyme des Manufactures des Glaces et Produits Chimiques de Saint-Gobain, Chauny & Cirey, Assignee-Substituted).**

**Patent Appeal No. 6382.**

United States Court of Customs and Patent Appeals.
Dec. 15, 1958.
As Corrected April 22, 1959.