# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 21, 2015          Decided December 1, 2015

No. 13–5370

CANONSBURG GENERAL HOSPITAL,
APPELLANT

v.

SYLVIA MATHEWS BURWELL, SECRETARY,
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:09–cv–02385)

*Sven C. Collins* argued the cause for the appellant. *Stephen P. Nash* was with him on brief.

*Benjamin M. Shultz*, Attorney, United States Department of Justice, argued the cause for the appellee. *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Vincent H. Cohen, Jr.*, Acting United States Attorney and *Michael S. Raab*, Attorney, were with him on brief. *R. Craig Lawrence*, Assistant United States Attorney, entered an appearance.

Before: HENDERSON, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by Circuit Judge HENDERSON.

KAREN LECRAFT HENDERSON, Circuit Judge: To administer Medicare reimbursements to healthcare providers, the Congress authorized the Secretary (Secretary) of the Department of Health and Human Services (HHS) to promulgate regulations setting the maximum cost amount HHS may reimburse a healthcare provider for services provided a Medicare beneficiary. Pursuant to this authority, the Secretary issued regulations setting out reasonable cost limits (RCLs) for specified medical services and establishing certain exceptions to those limits. Canonsburg General Hospital (Canonsburg) was the beneficiary of one such exception for many years beginning in 1987. Then, in 1998, it alleged that the Secretary's revised calculation of the exception unlawfully created a "reimbursement gap", which unfairly deprived it of the reasonable costs of its services. In 2001, Canonsburg contested the recalculation in a lawsuit brought in federal district court in Pennsylvania. *Canonsburg Gen. Hosp. v. Thompson* (*Canonsburg I*), No. 00-cv-0284, 2001 WL 36339671 (W.D. Pa. Feb. 28, 2001). The district court upheld the Secretary's action. *See id.* at *5. In this case, Canonsburg continues to claim that the Secretary has violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, because her method of calculation is inconsistent with governing regulations and was promulgated without notice and comment. In light of *Canonsburg I*, the district court granted the Secretary's motion for summary judgment, concluding that issue preclusion barred Canonsburg's suit. *Canonsburg Gen. Hosp. v. Sebelius* (*Canonsburg II*), 989 F. Supp. 2d 8, 30 (D.D.C. 2013). For the reasons set forth below, we affirm.

# I. BACKGROUND

## A. REASONABLE COST LIMITS AND THE ATYPICAL SERVICES EXCEPTION IN MEDICARE REIMBURSEMENT

Through the Centers for Medicare and Medicaid Services (CMS), the Secretary provides for the reimbursement of the reasonable costs of healthcare services for Medicare beneficiaries. *See* 42 U.S.C. § 1395f(b)(1)(A). Two aspects of the reimbursement scheme are relevant here.

The first is the system for managing the costs of reimbursement. Healthcare providers submit requests for reimbursement for services provided to Medicare beneficiaries, subject to the RCLs the Secretary has calculated based on statutory and regulatory restrictions. *See* 42 U.S.C. §§ 1395c–1395g; *see also St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 939–43 (6th Cir. 2000) (explaining how the Secretary calculates RCLs). The Secretary may adjust RCLs according to certain exceptions and allow skilled nursing facilities (SNFs) to be reimbursed above the established RCLs. *See* 42 U.S.C. § 1395yy(c); 42 C.F.R. § 413.30(e).

One such exception is the "atypical services" exception, which generally allows a healthcare provider to be reimbursed above the RCLs if the service it provides is, *inter alia*, "atypical in nature and scope."[1]  42 C.F.R. § 413.30(e)(1).

---

[1]  The "atypical services" exception initially provided for an upward adjustment to an RCL if "[t]he provider can show that the:

> (i) Actual cost of items or services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified; and

For years, both hospital-based and freestanding SNFs [2] received full reimbursement for atypical services under this exception. *See Canonsburg II*, 989 F. Supp. 2d at 13. In 1994, however, that changed. In order to effect congressionally directed cost savings, the Secretary altered the calculation for the atypical services exception for hospital-based SNFs. The new calculation, set forth in section 2534.5 of the Medicare Provider Reimbursement Manual (section 2534.5), created a reimbursement "gap" for hospital-based SNFs. Ctrs. for Medicare & Medicaid Servs., Provider Reimbursement Manual Part I § 2534.5, *available at* http://wayback.archive-it.org/2744/20111201152312/http://www.cms.gov/Manuals/PBM/list.asp (last visited Nov. 16, 2015). Whereas freestanding SNFs continued to receive reimbursement for the full cost of their atypical services, hospital-based SNFs were reimbursed below full cost. *St. Francis*, 205 F.3d at 941–43 (explaining section 2534.5 gap created for hospital-based SNFs).

---

> (ii) Atypical items or services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care."

42 C.F.R. § 413.30(f)(1) (1996) (currently promulgated with non-material alterations at 42 C.F.R. § 413.30(e)(1)); *see also* Limitations on Coverage of Costs Under Medicare, 39 Fed. Reg. 20,164, 20,165 (June 6, 1974) (describing original atypical services exception). As discussed *infra* n.3, the 1996 regulation is the version relevant to this appeal.

[2] In calculating RCLs, the Secretary categorized healthcare providers into four groups depending on whether the provider's facility is freestanding or hospital-based and on whether the facility is urban or rural. 42 U.S.C. § 1395yy(a).

The second relevant aspect of the Medicare reimbursement scheme involves the claims process itself. Under that process, an SNF submits a claim for reimbursement to a private intermediary, which processes the claim and provides reimbursement under CMS's authority. *See* 42 U.S.C. § 1395kk-1(a). The provider can appeal an unfavorable reimbursement decision to the Provider Reimbursement Review Board (PRRB), *id.* § 1395oo(a), whose members are appointed by the Secretary, *id.* § 1395oo(h). All proceedings before the PRRB are between the provider and the intermediary—neither the Secretary nor CMS is a party to the proceedings and the Secretary can participate only by filing an amicus brief or by providing counsel for the intermediary. 42 C.F.R. § 405.1843(a)–(d). The Secretary, however, has the discretionary authority to reverse, affirm or modify the PRRB's decision. *See* 42 U.S.C. § 1395oo(f)(1). The provider can seek review of the PRRB's decision—or the Secretary's decision if she exercises her discretion—in the district court "for the judicial district in which the provider is located" or in the "District Court for the District of Columbia". *Id.*

## B. WESTERN DISTRICT OF PENNSYLVANIA LITIGATION

Canonsburg is a hospital-based SNF that has participated in the Medicare reimbursement program since 1984. Beginning in fiscal year 1987, Canonsburg applied for, and obtained, the atypical services exception for costs exceeding its RCLs. In 1994, however, the Secretary's revised gap methodology interpretation of section 2534.5 began to limit Canonsburg's reimbursements.[3]

---

[3] The Congress has since eliminated retrospective cost-based reimbursements for all SNFs and replaced that system with a prospective payment scheme. *See* Balanced Budget Act of 1997,

In 2001, Canonsburg appealed a final reimbursement decision of the Secretary in the Western District of Pennsylvania, challenging section 2534.5 as applied to its reimbursements for fiscal years 1987 through 1990 and 1993. *See Canonsburg I*, 2001 WL 36339671, at *1. Canonsburg alleged that section 2534.5 was arbitrary, capricious and inconsistent with statutory language because it (1) "violate[d] the applicable cost limit statu[t]e, 42 U.S.C. § 1395yy(c), and regulation, 42 C.F.R. § 413.30(f)"; (2) was procedurally invalid because "it is a substantive r[u]le, yet it was not passed pursuant to the notice and comment requirements" of the APA; and (3) unreasonably discriminated between freestanding and hospital-based SNFs "in the exception process." *Canonsburg I*, 2001 WL 36339671, at *3–4. The district court rejected all of Canonsburg's arguments, relying heavily on a Sixth Circuit decision upholding section 2534.5. *See Canonsburg I*, 2001 WL 36339671, at *4–5 (citing *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937 (6th Cir. 2000)). The court first concluded that the statutory language (42 U.S.C. § 1395yy), as well as the regulatory language (42 C.F.R. § 413.30), regarding reasonable costs was permissive, not mandatory, and that the Secretary's interpretation of the language was reasonable. *See Canonsburg I*, 2001 WL 36339671, at *4. The court also viewed section 2534.5 as an interpretative rule, not a substantive rule, and thus concluded that it did not require notice and comment. *See id.* Finally, the court found no merit in Canonsburg's discrimination argument, holding that

Pub. L. No. 105-33, § 4432(a), 111 Stat. 251, 414–20 (codified at 42 U.S.C. § 1395yy(e)). The amendments to the cost-based reimbursement system for SNFs applied to cost reporting periods beginning on or after July 1, 1998, *see* 42 U.S.C. § 1395yy(e)(2)(D); accordingly, Canonsburg's petition for review of its fiscal year *1996* reimbursement requires analysis of the earlier retrospective cost-based reimbursement system.

the Congress treated freestanding and hospital-based SNFs the same once it removed the excess costs from the hospital-based RCLs. *See id.* Canonsburg did not appeal the district court's grant of summary judgment in favor of the Secretary.

## C. ADMINISTRATIVE PROCEEDINGS

In the late 1990s—and separate from the *Canonsburg I* litigation—Canonsburg began an administrative challenge to its reimbursement for fiscal year 1996. Canonsburg included in its reimbursement request a disallowance of $470,528, corresponding to the gap created by section 2534.5, but nevertheless claimed that it should be entitled to those funds. The Medicare intermediary granted Canonsburg the atypical services exception in a May 4, 1998 decision but disallowed the $470,528 in costs corresponding to the section 2534.5 gap. The intermediary also disallowed an additional $46,765 of offset costs that, according to its calculations, should have been included in the section 2534.5 gap but were not listed in the disallowance filed with Canonsburg's reimbursement request. Canonsburg appealed the $526,293[4] of disallowed costs to the

---

[4] Canonsburg claimed an amount in controversy of $526,293 in its complaint. Compl. 15, ECF No. 1, *Canonsburg II*, No. 1:09-cv-02385 (D.D.C. Dec. 17, 2009). The complaint lists a self-disallowance amount of $470,528 and further disallowance of $46,765 by the intermediary. *Id.* ¶¶ 37–38. Canonsburg states that the intermediary disallowed $529,943 total in costs, *see id.* ¶ 39, but Canonsburg appealed only $526,293 to the PRRB, *see id.* The sum of the $470,528 in self-disallowance and $46,765 in additional intermediary disallowance is $517,293—the record does not manifest why the amount in controversy differs from the sum of the disallowances.

PRRB, which reversed the intermediary's decision. [5] Canonsburg made the same arguments before the PRRB that it had made in *Canonsburg I* in 2001 and also relied on more recent decisions invalidating section 2534.5 as arbitrary and capricious. *See St. Luke's Methodist Hosp. v. Thompson*, 315 F.3d 984, 988–89 (8th Cir. 2003) (striking down section 2534.5 because HHS misconstrued reimbursement for typical and atypical services costs); *Montefiore Med. Ctr. v. Leavitt*, 578 F. Supp. 2d 129, 133–34 (D.D.C. 2008) (finding section 2534.5 violated APA because HHS failed to provide notice and comment in promulgating section 2534.5); *Mercy Med. Skilled Nursing Facility v. Thompson*, No. C.A.99-2765TPJ, 2004 WL 3541332, at *2–3 (D.D.C. May 14, 2004) (same). Canonsburg did not mention *Canonsburg I* in its PRRB filings. The PRRB found section 2534.5 to be "illogical[]," concluding that the Secretary confused typical and atypical services costs in her section 2534.5 calculation and created a gap inconsistent with statute and regulation. *See* Provider Reimbursement Review Board Decision 41–42. The PRRB further concluded that section 2534.5 was procedurally infirm, reasoning that it was either a substantive rule promulgated without notice and comment or a revision to an interpretative rule which, because it constituted a "fundamental modification" of HHS's previous interpretation and was implemented without notice and comment, violated the holding in *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 586–88 (D.C. Cir. 1997) (requiring agencies to use notice and comment rulemaking when substantively revising interpretative rule), *abrogated by Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015).

---

[5] Canonsburg timely appealed the intermediary's decision to the PRRB but the PRRB did not decide Canonsburg's appeal until August 2009, almost a decade later.

On discretionary review of the PRRB decision, the CMS Administrator reversed the PRRB. [6]   The Administrator concluded that section 2534.5 is "reasonable and appropriate, as [it] closely adhere[s] to" the statutory and regulatory language establishing RCLs and "in no way alters, or revises, Medicare policy as set forth in the regulations" implementing the atypical services exception.   Decision of the Administrator 13–14.   She further determined that section 2534.5 does not "constitute . . . a change in policy requiring notice and comment rule-making under 5 U.S.C. § 552."   *Id*. at 15–16.

## D.   PROCEEDINGS IN D.C. DISTRICT COURT

Canonsburg timely filed the instant suit in district court seeking judicial review of the CMS Administrator's decision. As in *Canonsburg I*, Canonsburg argued that section 2534.5 is arbitrary and capricious because it is inconsistent with the governing statute and regulations, represents an arbitrary change to the Agency's longstanding interpretation of the regulations, was promulgated without required notice and comment and discriminates in favor of freestanding SNFs. The Secretary answered, raising issue preclusion as an affirmative defense.   *See generally* FED. R. CIV. P. 8(c)(1) (listing *res judicata* as an affirmative defense).   The Secretary subsequently moved for summary judgment, repeating her issue-preclusion argument and defending section 2534.5 on the merits.   Canonsburg opposed summary judgment, arguing that the Secretary had waived issue preclusion by failing to

---

[6]   The Secretary did not review the PRRB decision directly because her review authority is delegated under 42 U.S.C. § 1395oo(f) to the CMS Administrator.   *See generally* 42 C.F.R. § 405.1875 ("Administrator . . . . may immediately review any decision of the Board . . . .").   The Administrator's review represents HHS's final action in Canonsburg's appeal.

raise it during the administrative proceedings and that equity strongly disfavored application of issue preclusion in this case because none of the policy rationales that traditionally support issue preclusion applied to Canonsburg's suit.[7]

On October 17, 2013, the district court granted the Secretary's motion for summary judgment on the issue preclusion ground. *See Canonsburg II*, 989 F. Supp. 2d at 30. The court noted that Canonsburg did not dispute that the validity of section 2534.5 had been raised and contested, and actually and necessarily decided, in *Canonsburg I*. *See id.* at 17. It rejected Canonsburg's waiver and equity arguments. *See id.* at 18–19, 24–27. The court held "that, because the parties and issues are identical to those in *Canonsburg I*, . . . the plaintiff had a full and fair opportunity to litigate with adequate incentives to do so, and the application of issue preclusion would not inflict a fundamental unfairness on the plaintiff," Canonsburg was barred from relitigating the issues resolved in *Canonsburg I*. *Id.* at 30. Canonsburg timely appealed.

## II.  ANALYSIS

We review a grant of summary judgment *de novo*. *Dist. Hosp. Partners v. Burwell*, 786 F.3d 46, 54 (D.C. Cir. 2015). Summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "In reviewing a grant of summary judgment, we must view the

---

[7] Canonsburg also argued that the legal landscape regarding the *Paralyzed Veterans* doctrine had changed since *Canonsburg I*, thus preventing application of issue preclusion. Recognizing the Supreme Court's abrogation of the *Paralyzed Veterans* doctrine in *Perez*, 135 S. Ct. at 1206–07, during the pendency of the appeal, we instructed the parties to omit the argument from their briefs.

evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Woodruff v. Peters*, 482 F.3d 521, 526 (D.C. Cir. 2007) (internal quotation marks omitted). "[I]n a case like the instant one, in which the [d]istrict [c]ourt reviewed an agency action under the APA, we review the administrative action directly[,] according no particular deference to the judgment of the [d]istrict [c]ourt." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 440–41 (D.C. Cir. 2012) (quoting *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002)).

Under our precedent, a party is barred from relitigating an issue if three conditions are met:

> First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case. Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination.

*Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992), *cert denied*, 506 U.S. 1078 (1993) (citations omitted). Canonsburg claims that, under *Poulin v. Bowen*, 817 F.2d 865 (D.C. Cir. 1987), the Secretary waived her issue preclusion affirmative defense by failing to raise it during the administrative proceedings. Canonsburg further argues that, because the Secretary did not raise issue preclusion before asserting it as an affirmative defense in district court, the *Chenery* doctrine barred the district court's consideration of it in the first instance. Although Canonsburg does not dispute that the first two *Yamaha* requirements for issue preclusion are

met, conceding that it raised the same issues in *Canonsburg I* and that the *Canonsburg I* court actually and necessarily decided them, Arg. Recording at 2:58–3:30, it claims that issue preclusion works a basic unfairness to it because it is contrary to the policy underpinnings of the defense.

## A. ADMINISTRATIVE WAIVER UNDER *POULIN*

Canonsburg argues that, under *Poulin*, the Secretary's failure to raise issue preclusion before the PRRB—or on the Administrator's discretionary review of the PRRB—constitutes waiver of the defense in district court. We disagree.

In *Poulin*, the plaintiff filed for Social Security disability benefits in 1974 but his claim was denied by the Social Security Administration. *See* 817 F.2d at 868. He refiled his disability-benefits application in 1980 and the administrative law judge (ALJ), the Social Security Administration Appeals Council and the district court all rejected his application on the merits. *Id.* Although the Social Security Act, Pub. L. No. 74-271, 49 Stat. 620 (1935) (codified as amended at 42 U.S.C. §§ 301 *et seq.*), and HHS regulations gave the ALJ discretion to apply issue preclusion,[8] the ALJ declined to do so and instead reached the merits of the benefits decision. *See*

---

[8] "An administrative law judge *may* dismiss a request for a hearing under any of the following conditions: . . . (c) The administrative law judge decides that there is cause to dismiss a hearing request entirely or to refuse to consider any one or more of the issues because—(1) The doctrine of *res judicata* applies in that we have made a previous determination or decision under this subpart about your rights on the same facts and on the same issue or issues, and this previous determination or decision has become final by either administrative or judicial action . . . ." 20 C.F.R. § 404.957 (1986) (emphasis added).

*Poulin*, 817 F.2d at 868–69. After filing its answer in district court, HHS argued for the first time in its motion for judgment of affirmance that the denial of Poulin's 1974 benefits application meant that his 1980 application was barred by issue preclusion. *See id.* at 869. "The [d]istrict [c]ourt did not even address this tardy [issue preclusion] claim." *Id.* On appeal, we held that, if a claim has "been reconsidered on the merits to any extent and at any administrative level, it is . . . properly treated as having been, to that extent, reopened as a matter of administrative discretion" and "is also subject to judicial review to the extent of the reopening." *Id.* (quoting *McGowen v. Harris*, 666 F.2d 60, 65–66 (4th Cir. 1981)). Because HHS "expressly waived applicability of administrative *res judicata*" at the administrative stage, we concluded, "it may not now advance this doctrine as an alternate basis for its decision." *Id.* We further indicated that HHS's *res judicata* defense was "also waived" because it failed to raise the defense in its answer in district court as Federal Rule of Civil Procedure 8(c) requires.[9] *Id.* Thus, "[t]he failure to plead *res judicata*, coupled with the express waiver at the administrative level, precludes its application now." *Id.*

*Poulin* makes two uncontroversial points. First, an agency's failure to raise issue preclusion in its answer in *federal court* may constitute waiver under Federal Rule of Civil Procedure 8(c). *See id.* Second, an agency may not rely on issue preclusion to the extent it "express[ly]" exercises its discretion to reopen an earlier decision on the merits. *Id.* Both points are inapplicable here. First, the Secretary plainly raised issue preclusion in her answer to Canonsburg's federal

---

[9] "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: . . . *res judicata* . . . ." FED. R. CIV. P. 8(c).

complaint. Moreover, the Secretary did not reopen *Canonsburg I*, "express[ly]" or otherwise, *id.*, during the administrative proceedings. In *Poulin*, the first decision was an *administrative* decision and thus one that HHS had the power to revisit. *See id.* In this appeal, *Canonsburg I* is an earlier *judicial* decision which the Secretary is without authority to affect.

Even assuming the Secretary had the power to reopen *Canonsburg I*,[10] this appeal is a far cry from *Poulin*. The PRRB, which, according to the record, appears to have been unaware of *Canonsburg I*, interpreted section 2534.5 in the first instance on the basis of a circuit decision to which Canonsburg was not a party. *See* Provider Reimbursement Review Board Decision 43–44 (citing *St. Luke's*, 315 F.3d at 988–89). Moreover, the Secretary, unlike the *Poulin* ALJ, did not explicitly decline to apply issue preclusion but instead reversed the PRRB. Because the Secretary did not—and could not—reconsider *Canonsburg I* and, at the same time, she complied with Rule 8(c), *Poulin* is inapposite.

Our more recent precedent also defeats Canonsburg's argument that we have adopted a robust administrative waiver

---

[10] The Congress by statute authorizes the Secretary to administer reimbursements but it cannot authorize the reopening of a final judicial decision. *See generally Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19 (1995) ("[T]he Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy . . . ."); *see id.* ("A legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases." (quoting THE FEDERALIST No. 81, at 545 (Alexander Hamilton) (J. Cooke ed. 1961))).

doctrine in light of *Poulin*. In *Morris v. Sullivan*, 897 F.2d 553 (D.C. Cir. 1990), we explained that *Poulin* is "applicable only when the agency has clearly stated or otherwise demonstrated that it has in fact reopened the original case on the merits and consequently has held a mandatory . . . hearing to reconsider the prior claim afresh." *Id.* at 558; *cf. Sendra Corp. v. Magaw*, 111 F.3d 162, 167 (D.C. Cir. 1997) (under *Poulin*, agency decision is reviewable on the merits if it exercises discretion to reopen claim). In *Morris*, we noted that *Poulin* is limited to cases in which the agency fails to raise issue preclusion as an affirmative defense in district court or it expressly declines to apply issue preclusion when available during administrative proceedings. *Morris*, 897 F.2d at 557 n.8 ("Morris readily concedes, however, that factually, *Poulin* is distinguishable . . . in two important ways. First . . . [the *Poulin* ALJ] declined to exercise his discretion to dismiss" on the basis of *res judicata* and, second, "the Secretary in *Poulin* failed to plead *res judicata* as a defense, thereby waiving his right to interpose it" (some alteration in original)); *see generally Nixon v. United States*, 978 F.2d 1269, 1297 (D.C. Cir. 1992) (Henderson, J., concurring) (in *Poulin*, court "did no more than state that parties waive their own right to raise *res judicata* by failing to plead it"). And in *Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72 (D.C. Cir. 1997), we declared, citing *Poulin*, that "[r]es judicata is an affirmative defense that may be lost if not pleaded in the answer; it may not ordinarily be asserted for the first time on appeal." *Id.* at 76; *see also U.S. Postal Serv. v. NLRB* (*USPS*), 969 F.2d 1064, 1069 (D.C. Cir. 1992) ("[C]ourts do not force preclusion pleas on parties who choose not to make them . . . ."). Other circuits have also refrained from developing any administrative waiver doctrine for issue preclusion that extends beyond our analysis in *Poulin*. *See, e.g.*, *Chavez v. Bowen*, 844 F.2d 691, 692–93 (9th Cir. 1988) (allowing *res judicata* claim on appeal despite ALJ failing to consider *res*

*judicata* defense in subsequent administrative decision); *cf. Kane v. Heckler*, 776 F.2d 1130, 1132 (3d Cir. 1985) ("[W]here the administrative process does not address an earlier decision, but instead reviews the entire record in the new proceeding and reaches a decision on the merits, the agency has . . . waived application of *res judicata*."). At most, one circuit has included an unsupported statement in a footnote regarding administrative waiver. *See, e.g.*, *Mun. Resale Serv. Customers v. FERC*, 43 F.3d 1046, 1052 n.4 (6th Cir. 1995) (stating, in footnote without citation to other authority, court would not recognize *res judicata* defense because defense was not invoked before agency).

In sum, the Secretary did not waive her issue preclusion affirmative defense by not raising it at the administrative stage;[11] moreover, she asserted it, expressly and properly, in district court and we are thus free to affirm the district court's application of the doctrine to Canonsburg's complaint.

## B.  ISSUE PRECLUSION AND *CHENERY*

Next, Canonsburg argues that the district court violated the *Chenery* doctrine by considering the Secretary's issue preclusion defense even though issue preclusion was not raised during the administrative proceedings. We disagree.

In *SEC v. Chenery Corp.* (*Chenery I*), 318 U.S. 80 (1943), the Supreme Court explained that "the courts cannot exercise their duty of review unless they are advised of the

---

[11] Our analysis does not encompass agency adjudications that require, by express regulation, that affirmative defenses be raised before the agency. *See, e.g.*, *Canady v. SEC*, 230 F.3d 362, 365 (D.C. Cir. 2000) (failure to raise statute of limitations affirmative defense before SEC constituted waiver based on pleading requirements set forth in SEC regulations).

considerations underlying the action under review." *Id.* at 94. When an agency action rests upon "an exercise of judgment in an area which Congress has entrusted to the agency . . . the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *Id.*; *see also id.* at 88 ("If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment."). The Supreme Court further elucidated the *Chenery* doctrine in *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194 (1947):

> [A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Id.* at 196. Neither *Chenery I* nor *Chenery II* addressed judicial doctrines such as issue preclusion. The Court did explain, however, that *Chenery* applies to "a determination or judgment which an administrative agency *alone* is authorized to make," *Chenery II*, 332 U.S. at 196 (emphasis added); in other words, to an agency's "exercise of judgment in an area which Congress has entrusted to the agency," *Chenery I*, 318 U.S. at 94. Issue preclusion is not a determination specially entrusted to an agency's expertise; it is instead the sort of

antecedent determination that a court usually makes. Simply put, *Chenery* does not apply to legal principles like issue preclusion. *See Chenery II*, 332 U.S. at 196; *Chenery I*, 318 U.S. at 94.

Our precedent is in accord. We have explained that *Chenery* only limits judicial review of "factual determination[s] or . . . policy judgment[s] that [the agency] alone is authorized to make." *Shea v. Dir.*, *Office of Workers' Comp. Programs*, 929 F.2d 736, 739 n.4 (D.C. Cir. 1991).[12] Indeed, we held in *Horne v. Merit Systems Protection Board* that "[t]he rule established in *Chenery* only applies to agency actions that involve policymaking or other acts of agency discretion." 684 F.2d 155, 158 n.4 (D.C. Cir. 1982); *cf. Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485, 1489 (D.C. Cir. 1983) (explaining that exhaustion of administrative remedies should not apply where "strictly a legal issue" is in dispute, "[n]o factual development or application of agency expertise will aid the court's decision" and "a decision by the court [will not] invade the field of agency expertise or discretion" (citations omitted)). Moreover, other circuits have declined to interpret *Chenery* as Canonsburg would have it. *See, e.g.*, *In re Comiskey*, 554 F.3d 967, 974 (Fed. Cir. 2009) ("In [*Chenery I*], the Supreme

---

[12] In *USPS*, we relied on *Chenery I* in denying an *intervenor's* attempt to press an issue preclusion defense on appeal. *See* 969 F.2d at 1069 ("[W]e reject [the intervenor's] endeavor to achieve disposition of this case on a rationale [not] set forth by the agency itself." (internal quotation marks omitted) (some alteration in original) (citing, *inter alia*, *Chenery I*, 318 U.S. at 93–95)). But the *USPS* intervenor attempted to raise preclusion for the first time on appeal. *See U.S. Postal Serv.*, 303 N.L.R.B. 463 (1991) (declining to address any potential issue preclusion argument). Here, the Secretary, not an intervenor, timely asserted the defense in district court. For this reason, we find *USPS* inapposite.

Court made clear that a reviewing court can (and should) affirm an agency decision on a legal ground not relied on by the agency if there is no issue of fact, policy, or agency expertise."); *RNS Servs., Inc. v. Sec'y of Labor*, 115 F.3d 182, 184 n.1 (3d Cir. 1997) (explaining that *Chenery I* does not apply if "no factual or other determination that Congress sought to exclusively entrust to the [Federal Mine Safety and Health Review] Commission is being intruded upon by the courts." (internal quotation marks omitted)).[13]

Canonsburg claims that the only recognized exception to the *Chenery* doctrine applies to the agency reaching a result mandated by statute but for the wrong reason. *See United Video, Inc. v. FCC*, 890 F.2d 1173, 1190 (D.C. Cir. 1989) ("Hence, *Chenery* reversal is not necessary where, as here, the agency has come to a conclusion to which it was bound to

---

[13] The Federal Circuit stated in dicta in an unpublished opinion, *Cabrera v. OPM*, 980 F.2d 743, 1992 WL 279390, at *1 n.1 (Fed. Cir. 1992) (per curiam) (unpublished table disposition), that it "appear[ed]" that an agency's decision could not be upheld on *res judicata* grounds because the defense had not been raised before the agency. But that decision, besides being nonprecedential, conflicted with an earlier precedential Federal Circuit decision. *See Spears v. Merit Sys. Prot. Bd.*, 766 F.2d 520, 523 (Fed. Cir. 1985) (*Chenery* doctrine did not prevent court from dismissing appeal on *res judicata* grounds even though agency did not analyze *res judicata* in first instance because "any action by the MSPB would not involve policymaking or discretion"); *see also Deckers Corp. v. United States*, 752 F.3d 949, 964 (Fed. Cir. 2014) ("[A] panel of this court . . . is bound by the precedential decisions of prior panels unless and until overruled by an intervening Supreme Court or en banc decision."). *Cabrera* thus has little, if any, persuasive power. In addition, the Sixth Circuit's similar treatment of the *Chenery* doctrine in *Municipal Resale Service Customers*, *supra* at 16, contained little analysis. *See* 43 F.3d at 1052 n.4.

come as a matter of law, albeit for the wrong reason, and where, as here, the agency's incorrect reasoning was confined to that discrete question of law and played no part in its discretionary determination."). But Canonsburg fails to recognize that the court's consideration of a judicial doctrine like issue preclusion does not constitute an *exception* to *Chenery*—*Chenery* simply does not apply to the issue in the first place. *See Horne*, 684 F.2d at 158 n.4 ("The rule established in *Chenery only applies* to agency actions that involve policymaking or other acts of agency discretion." (emphasis added)).

In light of the Supreme Court's plain language in *Chenery I* and *II*, our own construction of the *Chenery* doctrine and no persuasive case law to the contrary, we conclude that the *Chenery* doctrine does not prohibit raising issue preclusion as an affirmative defense in district court even if the party raising the defense was not a party to the administrative proceeding or was otherwise unable to assert the defense at the administrative stage.

## C. EQUITABLE CONSIDERATIONS

Finally, Canonsburg argues that applying issue preclusion here is unfair to it. It maintains that equity strongly supports its position because the Secretary has allegedly engaged in a pattern of settling litigation challenging section 2534.5 at the district court level before we can rule on its validity.

"There is no general public policy exception to the operation of *res judicata*." *Apotex, Inc. v. FDA*, 393 F.3d 210, 219 (D.C. Cir. 2004); *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981) ("There is simply no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of *res judicata*." (internal quotation marks omitted)). We limit equitable exceptions to

issue preclusion to certain limited circumstances, none of which applies here.  First, we have explained that issue preclusion is inappropriate if there has been an intervening "change in controlling legal principles."  *See Apotex*, 393 F.3d at 219.  Second, we have recognized that issue preclusion would be unfair "if the party to be bound lacked an incentive to litigate in the first trial, especially in comparison to the stakes of the second trial."  *Otherson v. Dep't of Justice*, 711 F.2d 267, 273 (D.C. Cir. 1983) (citing *Blonder-Tongue Labs.*, *Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 333 (1971)).  In *Yamaha*, we clarified that, in weighing a party's incentive to litigate, we should be concerned with whether "the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude." 961 F.2d at 254.  Similarly, application of issue preclusion is inappropriate if the "prior proceedings were seriously defective."  *Martin v. Dep't of Justice*, 488 F.3d 446, 455 (D.C. Cir. 2007) (quoting *Blonder-Tongue Labs.*, 402 U.S. at 333).

We have been reluctant to expand these equitable exceptions.  For example, we have recognized that even a "patently erroneous" first judgment is insufficient to bar issue preclusion.  *Otherson*, 711 F.2d at 277; *see id.* ("erroneous" first judgment does not demonstrate unfairness sufficient for court to decline to give judgment preclusive effect); *see also City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013) ("A court's power to decide a case is independent of whether its decision is correct, which is why even an erroneous judgment is entitled to *res judicata* effect.").  And, if there is mutuality of parties in successive litigation, we explained that "courts should refuse to give the first judgment preclusive effect on grounds that the party lacked adequate incentive to litigate in the first proceeding *only* upon a *compelling* showing of unfairness."  *Otherson*, 711 F.2d at 277 (emphases added)

(internal quotation marks omitted). Thus, if the parties have the same incentive to litigate in both the earlier and the subsequent litigation, if there is no change in the controlling law and if there is no concern about procedural defects in the first litigation, the application of issue preclusion is unlikely to result in a "compelling" showing of unfairness to the party against which it is asserted. *See, e.g.*, *Venetian Casino Resort, LLC v. NLRB*, 484 F.3d 601, 610 (D.C. Cir. 2007) ("We can discern no difference between the incentives that the [plaintiff] may have had in its [earlier] litigation and its incentives here. The stakes in its attempt before that court were no less than they are now.").

As the district court correctly concluded, Canonsburg's incentive to fully litigate the validity of section 2534.5 in *Canonsburg I* was at least equal to its incentive in *Canonsburg II*. *See Canonsburg II*, 989 F. Supp. 2d at 19. In fact, the amount in controversy in *Canonsburg I* was over twice the amount in controversy in *Canonsburg II*. *Compare* Compl. 15, ECF No. 1, *Canonsburg II*, No. 1:09-cv-02385 (D.D.C. Dec. 17, 2009) (claiming $526,293 as amount in controversy), *with* Compl. 15, ECF No. 1, *Canonsburg I*, No. 2:00-cv-00284 (W.D. Pa. Feb. 11, 2000) (claiming $1,123,755 as amount in controversy).

Issue preclusion protects the functioning of the courts by promoting finality and avoiding the unnecessary expenditure of judicial resources, *see Stanton*, 127 F.3d at 78, regardless of the possibility that an agency decision might later be found to be superfluous.[14] Canonsburg argues that *Mercy Medical* and

---

[14] We reject Canonsburg's claim that, had the district court reached the merits, it would have likely *not* resulted in inconsistent judicial decisions. Even though the Sixth and Eighth Circuits have split on the question of section 2534.5's validity, *compare St. Francis*, 205 F.3d at 944–48 (upholding Secretary's interpretation),

*Montefiore Medical* are cases in which the district court found section 2534.5 invalid under the APA but the Secretary settled both before we could consider the merits of the Secretary's interpretation of the atypical services exception. Although we agree with the district court that the settlements have prevented a definitive resolution of the Secretary's interpretation of the atypical services exception in section 2534.5, we also agree that they are largely irrelevant to our issue preclusion analysis. *See Canonsburg II*, 989 F. Supp. 2d at 29. First, Canonsburg itself chose not to appeal *Canonsburg I* to the Third Circuit so that its opposition to HHS's settlement practice rings hollow. Second, we have long recognized the public interest in, and importance of, settlement of litigation. *See Am. Sec. Vanlines, Inc. v. Gallagher*, 782 F.2d 1056, 1060 (D.C. Cir. 1986) ("Few public policies are as well established as the principle that courts should favor voluntary settlements of litigation by the parties to a dispute."); *see also Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims are favored by the courts . . . ."). Finally, the Secretary's decision to settle unrelated cases does not result in any particular harm to Canonsburg beyond the costs of this litigation.

---

*with St. Luke's*, 315 F.3d 988–89 (rejecting Secretary's interpretation), the fact that another district court decision on the merits would merely add to, but not create, an inconsistency does not support declining to apply issue preclusion. Further, a merits decision here could result in inconsistent decisions involving *these two parties*, a concern that issue preclusion is intended to prevent. RESTATEMENT (SECOND) OF JUDGMENTS § 28 cmt. c (1982) ("[T]he outcomes of similar legal disputes between the same parties at different points in time should not be disparate.").

For the foregoing reasons, we affirm the district court's grant of summary judgment to the Secretary.

*So ordered.*