**NOT FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

SEP 25 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| JOSE RUBEN ALCOCER-VARGAS, <br><br> Petitioner, <br><br> v. <br><br> PAMELA BONDI, Attorney General, <br><br> Respondent. | No.  20-72118 <br><br> Agency No. A044-120-226 <br><br> MEMORANDUM[*] |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted September 15, 2025
San Francisco, California

Before: M. SMITH and BUMATAY, Circuit Judges, and BARKER,[**] District Judge.
Concurrence by Judge BARKER.

Petitioner Jose Ruben Alcocer-Vargas seeks review of an order of the Board

of Immigration Appeals directing his removal from this country to his country of

citizenship. We have jurisdiction under 8 U.S.C. § 1252(a). We grant the petition for

review and remand for further proceedings.

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**] The Honorable J. Campbell Barker, United States District Judge for the Eastern District of Texas, sitting by designation.

Because the parties are familiar with the facts and procedural history of this case, we do not recount them here except as necessary for context. As most relevant here, the government moves to remand the case, without confessing error. It does so for the Board to address petitioner's argument that his conviction for possession of drug paraphernalia is broader than required to trigger deportability under 8 U.S.C. § 1227(a)(2)(B)(i). Petitioner argues that his conviction is overbroad because it could have rested on paraphernalia for use with positional isomers of methamphetamine, which may not be federally controlled substances.

We grant the government's motion and remand the matter for further consideration because the Board failed to address petitioner's argument about positional isomers of methamphetamine. By remanding the case, we are following our practice in *Abdirahman v. Barr*, No. 19-72226, *Ordonez v. Garland*, No. 19-72860, and *Hernandez Rios v. Garland*, No. 23-822, in which we remanded for a more fulsome analysis before classifying a conviction.

The record does not require termination of petitioner's removal proceeding, as he urges. Rather, the agency's decision is simply bare of findings or analysis on any of five issues that may be relevant in the end:

1. Whether positional isomers of methamphetamine exist.

2. Whether any positional isomers of methamphetamine fall within the scope of the Arizona statute of conviction, if that statute only covers positional isomers

2

that are demonstrated to have "a potential for abuse associated with a stimulant effect on the central nervous system." Ariz. Rev. Stat. § 13-3401(6)(c).

3. Whether any positional isomers fall within the necessary basis of petitioner's conviction as narrowed by the modified categorical approach to "methamphetamine." In other words, whether a person's indictment and conviction for conduct involving that drug could rest on positional isomers of that drug, even if those isomers are not "methamphetamine" and even if those isomers have their own common name.

4. Whether any positional isomers of methamphetamine are federally scheduled as controlled substances under their own name or under a provision of federal law apart from 21 C.F.R. § 1308.12(d)(2)'s coverage of methamphetamine and its optical isomers. *See, e.g.*, 21 U.S.C. § 813(a) (Federal Analogue Act).

5. Whether, by identifying a "dangerous drug" solely because of its chemical isomerism relationship to methamphetamine, Arizona has defined a crime "relating to" methamphetamine within the meaning of the deportability provision charged here, 8 U.S.C. § 1227(a)(2)(B)(i).

The court expresses no view here on the merits of any of those issues or whether every one need be reached. We simply remand for the agency to address in the first instance petitioner's positional-isomer argument. The agency may consider any

3

other issues it deems relevant. Because we remand to allow for further explanation, rather than because of any identified error of law or fact, we leave the agency's order intact during the remand. *See Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022) (holding that whether to vacate an agency's action on remand turns first on "the seriousness of the agency's errors").

The petition for review is **GRANTED**, and the matter is **REMANDED WITHOUT VACATUR** to the agency. No costs awarded on appeal.

*Alcocer-Vargas v. Bondi*, No. 20-72118
BARKER, District Judge, concurring:

In my view, the court should end the over-six-year life of this removal proceeding by approaching the issues raised by petitioner's argument as follows:

- Even assuming for the sake of analysis that petitioner's conviction could rest on a positional isomer of methamphetamine, that is a crime "relating to" methamphetamine within the meaning of 8 U.S.C. § 1227(a)(2)(B)(i), so petitioner is deportable without further analysis of drug lists or chemistry.

- The Arizona concept of criminal isomers of methamphetamine matches facially with the federal concept of analogues of methamphetamine, which the Federal Analogue Act deems federal controlled substances for purposes of all federal law. Petitioner has not met his burden of showing a realistic probability that the Federal Analogue Act does not apply to any positional isomer upon which he claims his conviction could rest. For this reason as well, even petitioner's view of his conviction's scope makes him deportable.

- In any event, petitioner overrepresents the breadth of his methamphetamine conviction. The name "methamphetamine" refers to either of two *optical* isomers. *Positional* isomers of methamphetamine are "dangerous drugs" but are not "methamphetamine" itself, in law or in science. Petitioner has not shown a realistic probability that "methamphetamine" means something different under Arizona law and federal law. So the agency did not err by failing to analyze dangerous drugs other than methamphetamine.

I concur in the court's decision to remand only because the government itself moves for remand, evidently not understanding the nature of its own arguments.

## I.     Background and procedural history

### A.     Petitioner's Arizona drug conviction

Jose Ruben Alcocer-Vargas was born in and is a citizen of Mexico. He was admitted into this country as a lawful permanent resident in 1993. In 2018, he was

charged in Arizona state court with disorderly conduct involving domestic violence, possession of methamphetamine, and possession of drug paraphernalia involving methamphetamine.

The first two charges were dismissed upon his plea of guilty to the paraphernalia crime, a violation of Arizona Revised Statutes § 13-3415(A). The indictment specifically charged "methamphetamine" (capitalization altered) as the drug to which his paraphernalia was connected. Petitioner then agreed to plea agreement's factual basis stating that he had a "baggie with meth" in his pants pocket. And petitioner further agreed that Arizona Revised Statutes § 13-901.01 controlled the court's sentencing options because his offense involved "methamphetamine." The court sentenced petitioner to 60 days' incarceration and 36 months' probation.

## B.  Petitioner's removal hearing

Considering petitioner's drug-paraphernalia conviction and his prior convictions for DUI, assault, criminal damage, and disorderly conduct, immigration officials placed petitioner in removal proceedings. He was charged with being deportable under 8 U.S.C. § 1227(a)(2)(B)(i), which applies to aliens convicted of a state, federal, or foreign offense "relating to a controlled substance (as defined in section 802 of title 21)" other than a small amount of marijuana.

In a preliminary hearing, the Immigration Judge (IJ) supplied a standard legal memo on deportability under 8 U.S.C. § 1227. The memo explained this court's

2

three-step categorical approach to classifying a conviction and made conclusions about the treatment of Arizona drug laws under that approach. Petitioner's briefing included two declarations by an expert on organic chemistry, describing types of chemical isomerism and stating that at least 20 positional isomers of methamphetamine are possible. The IJ then made case-specific rulings about the nature of petitioner's conviction under the modified categorical approach.

The IJ's analysis tracked this court's three steps for classifying a conviction. First, the IJ held that the Arizona statute of conviction is broader than the generic, federal standard for deportable offenses because Arizona criminalizes activity involving more drug types. Although the deportability test does not require any particular type of act, it requires that the act relates to a federally controlled substance. The IJ noted that Arizona's definitions of "narcotic drugs" and "dangerous drugs" include some substances that are not federally controlled, so the IJ held that Arizona's drug crimes are categorically overbroad as to drug type.

Second, the IJ ruled that the modified categorical approach is available to narrow the necessary basis of a given conviction under the Arizona law here as resting on a specific drug. The IJ affirmed that, under Arizona law, a jury must unanimously agree on a specific drug to convict.

Third, the IJ applied the modified categorical approach by looking at charging documents to identify which drug the prosecutor in petitioner's case had to prove.

3

The IJ held that petitioner's conviction was specifically based on paraphernalia connected to methamphetamine, a drug on the federal schedules of controlled substances. So the IJ held that petitioner is deportable under 8 U.S.C. § 1227(a)(2)(B)(i). The IJ entered a conditional order that petitioner be removed to Mexico, absent voluntary departure.

### C. Petitioner's administrative appeal

Petitioner appealed to the Board of Immigration Appeals (BIA), which dismissed his appeal. As to this court's three steps of categorizing a conviction, the BIA agreed that:

- Arizona's drug lists are broader than the federal lists, making the drug-paraphernalia crime categorically broader than the federal standard.

- But the identity of the drug involved is an element of the Arizona paraphernalia crime, making the crime divisible as to drug identity.

- And petitioner's conviction records show that the prosecution had to and did connect his conduct to methamphetamine: both the indictment and factual basis specify that his violation involved methamphetamine.

The BIA thus held that petitioner's conviction necessarily rested on proof of methamphetamine, a federally controlled substance.

Petitioner opposed the BIA's holding for two reasons. First, he argued that the statute is not divisible by drug type at all, such that courts must ignore a criminal's admission to a specific drug. He does not renew that argument here.

4

Second, petitioner argued that even narrowing the basis of his conviction to methamphetamine is not good enough. One federal controlled substance is methamphetamine—including both of its optical isomers—although other types of isomers of methamphetamine may be federally scheduled under their own name or may be a "controlled substance analogue" that federal law deems a controlled substance.[1] Petitioner claimed that Arizona law is broader because "methamphetamine is defined to include methamphetamine and its . . . isomers, whether optical, positional, or geometric" (emphasis omitted). Petitioner cited no Arizona statute defining the term "methamphetamine" that way. He cited only the Arizona statute defining the term "dangerous drug" that way—to include isomers of many drugs, including methamphetamine.

The BIA did not specifically address the aspect of Arizona law that includes positional isomers of listed substances as "dangerous drugs." But neither did the BIA hold that it needed to address them. Instead, the BIA simply noted that, in petitioner's case, "the drug to which the paraphernalia was connected was methamphetamine."

---

[1] 21 C.F.R. § 1308.12(d)(2); Amphetamine, Methamphetamine, and Optical Isomers, 36 Fed. Reg. 12,734, 12,734–35 (July 7, 1971) (modifying the original federal schedules at 21 U.S.C. § 812 to list methamphetamine on schedule II alone); *see* 21 U.S.C. § 802(32), 813(a) (defining a "controlled substance analogue" and deeming each, to the extent intended for human consumption, as a controlled substance in schedule I for purposes of any federal law).

The BIA then rejected petitioner's argument that his reading of Arizona law was supported by this court's opinion in *Lorenzo v. Sessions*, 902 F.3d 930, 934 (9th Cir. 2018), *replaced on petition for rehearing by* 752 F. App'x 482 (9th Cir. Jan. 17, 2019). *Lorenzo* initially held that a California law was indivisible as between its prohibition of methamphetamine and its prohibition of optical and geometric isomers of methamphetamine. *Id.* at 938. But the panel in *Lorenzo* withdrew its opinion after a petition for rehearing, so it is not controlling, as the BIA noted. And even as to *Lorenzo*'s final reasoning, the BIA noted that there is no evidence that geometric isomers of methamphetamine exist in the first place, as could require analyzing them as a state basis of conviction or as a federal controlled substance.

The BIA's dismissal of petitioner's appeal triggered the IJ's removal order, so the BIA ordered petitioner removed to Mexico.

### D.      Proceedings in this court

After petitioner timely sought judicial review, his case was stayed given this court's certification to the Arizona Supreme Court of questions of law in *Romero-Millan v. Barr*, No. 16-73915. After the Arizona Supreme Court responded, *Romero-Millan* held that the Arizona drug-paraphernalia statute at issue here is "divisible as to drug type." 46 F.4th 1032, 1044 (9th Cir. 2022).

Petitioner then filed an opening brief arguing that, despite *Romero-Millan*, Arizona's alleged "definition of methamphetamine" is indivisible as between optical

6

isomers of methamphetamine, which are federally controlled, and positional isomers of methamphetamine, which he claimed are not federally controlled. In response, the government moved to remand so that the BIA could provide further explanation on "the isomer issue" and could ask the IJ for "development of the factual record." The government did not confess any error. Petitioner opposed remand, arguing that the removal proceeding must be terminated in his favor, and the court carried the remand motion with the case.

## II.    Analysis

In classifying a conviction under the categorical approach, we do not ask what a person actually did in breaking the law. We look only to what the prosecution had to prove to convict in a given case. *See Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 186 (2007) (applying the approach set forth in *Taylor v. United States*, 495 U.S. 575, 599–600 (1990)). We then ask if those elements of the offense meet the federal, generic standard or whether they are "overbroad" in relation to the federal standard.

In judging what the prosecution had to prove, we look to the criminal law of the governing body (here, Arizona) and the conviction records in an offender's case. The offender's judgment of conviction will almost always specify the statute of conviction. If all convictions under that statute require proof of facts that fall within the federal standard, federal consequences attach. We call that the first step in the categorical approach because it examines only what the judgment cites.

7

But proof requirements are defined by criminal procedure, which is not always memorialized in a judgment of conviction. In some cases, criminal procedure may require the prosecution to prove that a statute was violated in one among several ways. When that is so, a statute is "divisible" for purposes of classifying it federally. Judging a statute's divisibility is step two.

If a statute is divisible, we use the conviction records described in *Shepard v. United States*, 544 U.S. 13 (2005), to identify which facts within the statute's broader sweep the prosecution in the offender's case had to prove. That third step of determining a conviction's necessary basis is called the modified categorical approach. Whether at the first step or third step, however, the same inquiry applies upon identifying the set of necessarily proven facts. We ask whether those conviction elements categorically meet the federal, generic standard.

That inquiry is governed by the "realistic probability" test. It asks whether the conviction element and the generic element differ in a way producing "a realistic probability, not a theoretical possibility," that conduct outside of a generic standard would allow the conviction. *Duenas-Alvarez*, 549 U.S. at 193. A burden-shifting regime applies. When the two elements address the same concept, despite any phrasing differences, it becomes an offender's burden to show a realistic probability of a mismatch by pointing to his case or another case in which non-generic conduct satisfied the conviction element. *Id.* But when "a state statute explicitly defines a crime

8

more broadly than the generic definition," then overbreadth is shown because "no legal imagination is required to hold that a realistic probability exists that the state will apply its statute to conduct that falls outside the generic definition of the crime." *United States v. Grisel*, 488 F.3d 844, 845–47 (9th Cir. 2007) (en banc) (quotation marks omitted), *abrogated in part on other grounds by United States v. Stitt*, 586 U.S. 27 (2018).

Petitioner's conviction meets the deportability standard here for three reasons: (a) immigration law's "relating to" test requires a direct link to, not strict identity with, a federal controlled substance; (b) even were strict identity required, petitioner has not met his burden to show that positional isomers of methamphetamine are not federal controlled substances under the Federal Analogue Act; and (c) regardless, even the strictest view of the deportability standard is met here because petitioner was charged only with "methamphetamine," which means the same thing under Arizona law and federal law.

### A. The "relating to" standard for deportability

In judging the state conviction here against the deportability standard of federal immigration law, a logical first question is what immigration law requires. In my view, the answer to that question alone resolves this case.

As the Seventh Circuit has held, immigration law's "relating to" test is satisfied by a criminalized drug's direct link to a federally controlled substance. That

9

direct-link test is met by Arizona's definition of "dangerous drug" to include isomers of methamphetamine. So even if petitioner's conviction could rest on a "dangerous drug" related to methamphetamine, not methamphetamine itself, it creates deportability on the grounds charged here. We can decide this pure question of law without remanding, as this circuit and other circuits hold.

### 1. The question of Romanette i's scope after *Mellouli*

Romanette i of 8 U.S.C. § 1227(a)(2)(B) makes an alien deportable if he has been convicted of a violation of any state, federal, or foreign law "relating to a controlled substance (as defined in section 802 of title 21)." Section 802's definition of those controlled substances by reference to specific schedules is part of the Controlled Substances Act (CSA), so those substances are called § 802 drugs or CSA drugs. The CSA's schedules are updated by the Executive Branch, and their current content is codified at 21 C.F.R. §§ 1308.11–.15.

The Supreme Court has rejected "the argument that *any* drug offense renders an alien removable, without regard to the appearance of the drug on a § 802 schedule." *Mellouli v. Lynch*, 575 U.S. 798, 813 (2015). "Instead, to trigger removal under § 1227(a)(2)(B)(i), the Government must connect an element of the alien's conviction to a drug 'defined in [§ 802],'" *id.* at 813 (brackets in original), not merely to the "drug trade in general," *id.* at 809.

The agency in *Mellouli* did not establish any connection to a § 802 drug, so the Court did not decide what type of connection to a § 802 drug suffices under Romanette i. *See id.* (describing the BIA's view that "a paraphernalia conviction 'relates to' any and all controlled substances, whether or not federally listed, with which the paraphernalia can be used"). The dispute in *Mellouli* was whether a crime had to be linked to a § 802 controlled substance at all or, instead, whether a link to controlled substances generally sufficed. *Id.* at 808 n.9 ("If § 1227(a)(2)(B)(i) stopped with the words 'relating to a controlled substance,' the dissent would make sense. But Congress did not stop there. It qualified 'relating to a controlled substance' by adding the limitation 'as defined in [§ 802].'") (brackets in original). As the government here correctly notes, *Mellouli* did not consider whether a substance "relates to" a § 802 drug, for purposes of immigration law, when it is criminalized on account of its relationship to that very § 802 drug.

### 2.    Merits of a direct-link test over a strict-identity test

I would answer that question yes. In *Desai v. Mukasey*, the Seventh Circuit held that a non-CSA substance "relates to" a CSA drug, for purposes of immigration law, when defined and criminalized due to its direct link to that CSA drug. 520 F.3d 762, 764–66 (7th Cir. 2008). Applying that test, *Desai* held that an alien's conviction for distributing a look-alike to psilocybin, a CSA drug, made him inadmissible under immigration law's coverage of elements "relating to a controlled substance (as

11

defined in section 802 of title 21),” even though the look-alike was not itself a § 802 controlled substance. *Id.*

The Seventh Circuit began with the statutory text, noting that “the Supreme Court [has] looked to the dictionary to determine that the ordinary meaning of ‘relating’ is a broad one—to stand in relation; to have bearing o[r] concern; to pertain; refer, to bring in association with or connection with.” *Id.* at 764 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) (quoting Black’s Law Dictionary 1158 (5th ed. 1979))) (cleaned up). The court noted a second definition requiring a “logical and natural association” between items. *Id.* (quoting Webster’s II New Riverside University Dictionary 992 (1994)). I would endorse the same definitions.

The Seventh Circuit then applied those definitions to the crime at hand, reasoning that “violating [the criminal law] in the way that Desai did—by distributing something that would lead one to believe it contained Psilocybin—brings it into association with a federal controlled substance.” *Id.* at 765. The court held:

> [I]t is the fact that there is a relation between the Look-Alike and the controlled substance that justifies making the distribution of the Look-Alike illegal. To put it more bluntly, the idea of distributing a “Psilocybin Look-Alike” would not even exist as a legal (or linguistic) concept without its connection to, or relationship with, Psilocybin. The simulacrum and the thing itself are always connected.

*Id.* Likewise here. Criminalizing a drug only because it is an isomer of methamphetamine creates an offense that would not exist, as a legal or linguistic matter, without

the drug's relationship to methamphetamine. Hence, the drugs on which petitioner says his conviction could hypothetically rest—defined as isomers of methamphetamine—are drugs "related to" methamphetamine.

Congress wrote Romanette i to extend beyond a strict-identity test. As *Desai* noted, "there is explicit reference to state law in the text of the statute, and a broadening term that bridges the state law crimes with federal definitions of what counts as a controlled substance." *Id.* at 766. Congress's choice of that text, rather than a restrictive word like "involving," shows that it did not want "a one-to-one correspondence between the state laws and the federal CSA." *Id.*

That same analysis applies here. As used in Romanette i, "related to" means a direct link, not strict identity, between two drugs. *See Mellouli*, 575 U.S. at 810 (requiring a crime to "necessarily *implicate* a federally controlled substance") (emphasis added); *id.* at 812 (requiring "a direct *link* between an alien's crime of conviction and a particular federally controlled drug") (emphasis added). A drug defined only by its direct link to a federally controlled substance means that a crime involving that drug is "related to" that federally controlled substance. That is legally sound and common sense.

As *Desai* pointed out, there is nothing unusual about federal immigration consequences attaching to state crimes that go beyond federal crimes. An alien's state offense need not itself be a hypothetical federal offense to count as a crime "relating

13

to" a federal CSA drug. For example, although federal law does not criminalize mere possession or use of drug paraphernalia, 21 U.S.C. § 863, the Arizona offense of possession or use of drug paraphernalia is still a deportable offense when the drug involved is cocaine, a federal CSA drug. *Romero-Millan*, 46 F.4th at 1038, 1041. The Seventh Circuit thus correctly rejected the "hypothetical-federal-felony approach" to immigration law's "relating to" test. *Desai*, 520 F.3d at 765.

Finally, to the extent that statutory purpose matters, a direct-link "understanding of the 'relating to' language is informed by Congress's consistent effort to target aliens who are involved in drug-related activities." *Peters v. Ashcroft*, 383 F.3d 302, 306–07 (5th Cir. 2004). As this court observed in considering another immigration statute, "[n]othing in the legislative history suggests Congress intended to limit the broad scope of this ['relating to'] language" to require strict identity with a federal crime. *Forstner v. INS*, 579 F.2d 506, 507 (9th Cir. 1978) (per curiam).

The direct-link test would resolve this case without any need to address organic chemistry. It would give effect to Arizona's own judgment call in defining isomers of methamphetamine to be dangerous drugs. Specifically, Arizona added the isomer definition in response to the rising use of synthetic drugs, whose chemical formulas are altered to thwart prosecution. H.B. 2327, 51st Leg., 1st Sess. (Ariz. 2013); *see* Senate Research Staff, Fact Sheet for H.B. 2327, 51st Leg., 1st Sess. (Ariz. 2013). Because isomers of methamphetamine count as dangerous drugs only

because of their chemical relationship to methamphetamine, crimes involving those isomers definitionally and directly "relate to" methamphetamine.

### 3. Remand is not required to uphold the order on this basis.

The court has authority to adopt that legal interpretation now. The government preserves that argument here but believes that remand is required under the *Chenery* doctrine. But "*Chenery* only limits judicial review of factual determinations or policy judgments that the agency alone is authorized to make." *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304 (D.C. Cir. 2015) (cleaned up; collecting cases). After *Loper-Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), courts owe no deference to BIA interpretations of immigration law. *Murillo-Chavez v. Bondi*, 128 F.4th 1076, 1087 (9th Cir. 2025). So just as this court has found "no reason to remand for the BIA to decide the issue of divisibility in the first instance," there is no reason to remand here. *Sandoval v. Sessions*, 866 F.3d 986, 993 (9th Cir. 2017).

The government's cited remand cases deal with a different matter—a policy or judgment reserved to the agency, as to which courts exercise deferential review. *E.g., SEC v. Chenery*, 318 U.S. 80, 88 (1943) ("[If] an order is valid only as a determination of *policy or judgment* which *the agency alone* is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment.") (emphases added); *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (remanding for examination of changed country circumstances: "a court

15

of appeals should remand a case to an agency for decision of *a matter that statutes place primarily in agency hands*") (emphasis added); *Altamirano v. Gonzales*, 427 F.3d 586, 595 (9th Cir. 2005) ("*Chenery* requires that an agency's *discretionary order* be upheld, if at all, on the same basis articulated in the order by the agency itself[.]") (emphasis added).

But a matter of legal interpretation that courts review without deference to the agency is not a policy matter, a fact found from a record, or a matter of discretion subject to *Chenery*. This court has so held. *Sandoval*, 866 F.3d at 993. Other circuits agree. *In re Aoyama*, 656 F.3d 1293, 1299 (Fed. Cir. 2011) ("*Chenery* does not stand for so broad a proposition."); *Canonsburg*, 807 F.3d at 305 (same). Indeed, *Chenery* expressly did not disturb the rule that an appellate court need not send a case back for a tribunal "to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate." 318 U.S. at 88.

Here, the BIA found petitioner deportable under Romanette i because his conviction was for a crime "related to" a federally controlled substance, methamphetamine. I would uphold that conclusion because Romanette i's "related to" test is satisfied by the criminalized chemical relationship to methamphetamine that petitioner claims his conviction could have rested on (although that claim is wrong too). That course would follow the letter and spirit of *Chenery*, which itself emphasized the

16

wastefulness of sending a case back when an issue within the appellate court's power disposes of the matter. *Id.*

**B.      Scope of federal controlled substances**

Romanette i's deportability standard is broader than petitioner acknowledges for a second reason. Just as Arizona "dangerous drugs" include chemical isomers, salts, and salts of isomers of certain listed substances, federal "controlled substances" include chemical analogues of certain listed substances, including methamphetamine. 21 U.S.C. §§ 802(32), 813(a) ("A controlled substance analogue shall, to the extent intended for human consumption, be treated, *for the purposes of any Federal law* as a controlled substance in schedule I.") (emphasis added); 21 C.F.R. § 1308.12(d)(2); *Deocampo v. Barr*, 766 F. App'x 550, 553 n.3 (9th Cir. 2019) (unpublished) (upholding a final order of removal entered under Romanette i: "Those substances not expressly listed in the Federal schedules are 'controlled substance analogues,' considered Schedule I controlled substances under the CSA.").

I would hold that the Federal Analogue Act creates a conceptual match between the two drug categories in dispute here, placing the burden on petitioner to show that the positional isomers of methamphetamine upon which he focuses are outside the federal law's sweep. As the Supreme Court held in *Duenas-Alvarez*, where the "concepts" in two laws match "significantly," the "offender" assumes the burden to show that the statute of conviction would be applied to conduct outside

17

the federal law's sweep. 549 U.S. at 193 (holding that the alien's argument failed "[b]ecause [he] makes no such showing here").

This is not a case where a state's definition is explicitly broader than the federal standard. *Cf. Grisal*, 488 F.3d at 850 (noting that a state law explicitly defined "building" to have meanings "in addition to its ordinary meaning"). Rather, Arizona and federal law each cover, as to methamphetamine, substances with a culpable chemical similarity. Arizona's law has more detail about the precise nature of a qualifying chemical relationship. But the conceptual match shifts the burden to petitioner to "at least point to his own case or other cases in which the state courts in fact did apply" the Arizona statute to drugs that he shows are outside the federal standard. *Duenas-Alvarez*, 549 U.S. at 193. Because petitioner has not done so, he loses even if his broad view of his conviction's drug element is correct (and it is not).

The government's supplemental brief endorses this reasoning and specifically notes that the court "could resolve this matter as an issue of statutory interpretation." Yet, when asked at oral argument, the government declined to withdraw its motion to remand. I thus concur in the decision to remand only because of the party-presentation principle, even though a court generally "can (and should) affirm an agency decision on a legal ground not relied on by the agency if there is no issue of fact, policy, or agency expertise." *In re Comiskey*, 554 F.3d 967, 974 (Fed. Cir. 2009).

18

## C. Scope of petitioner's Arizona conviction

After identifying the relevant federal standard, the categorical approach then identifies the conduct that the prosecution had to prove to secure a given person's conviction. That is a question of law that a court reviews de novo. This court has already held that the Arizona drug-paraphernalia statute is divisible by drug type. And the drug type charged here was methamphetamine, a CSA drug. That should resolve the matter.

Petitioner speculates that "methamphetamine" means something broader under Arizona law than under federal law. But no Arizona law defines "methamphetamine" that way. Nor does petitioner cite any case in which Arizona courts allowed a person charged with "methamphetamine" to be convicted based on a positional isomer of methamphetamine—or anything other than the two optical isomers that fall within the common name "methamphetamine." So even assuming that the federal standard requires strict identity and ignores the Federal Analogue Act, petitioner does not show a realistic probability that his drug element is overbroad.

### 1. The court can reach this question of law without remanding.

Interpretation of a state criminal code is a question of law, on which we need not remand. *Sandoval*, 866 F.3d at 993. The government's motion to remand suggests that the meaning of terms in Arizona law must be decided by an Immigration Judge, based on evidence introduced by the parties, and then reviewed by courts

under the substantial-evidence standard. That is wrong. "Because Congress predicated deportation 'on convictions, not conduct,' the [categorical] approach looks to the statutory definition of the offense of conviction." *Mellouli*, 575 U.S. at 805. Only statutory interpretation is involved.

Avoiding fact-finding and its attendant procedures is the point. The Supreme Court uses the categorical approach because it does not "burden a system" of immigration law "in which large numbers of cases are resolved by immigration judges" by creating administrative inefficiency and the possibility of different findings in different cases. *Id.* at 806 (giving "efficiency, fairness, and predictability" as the approach's virtues). Thus, interpreting a state's substantive and procedural criminal law when applying the categorical approach "requires neither factual development nor agency expertise and is properly analyzed by this court." *Rivera v. Lynch*, 816 F.3d 1064, 1078 n.13 (9th Cir. 2016).

In arguing that remand is required, the government confuses adjudicative facts with legislative facts. "Generally speaking, adjudicative facts are facts developed in individual cases regarding particularized facts, while legislative facts involve broader issues, which are more universally applicable." *Calvin v. Heckler*, 782 F.2d 802, 806 n.4 (9th Cir. 1986) (citing Kenneth Culp Davis, 2 *Administrative Law Treatise* §§ 15:2–15:3 (1980)).

20

Adjudicative facts must indeed be found by the agency, and their review by a court is limited by the record rule and the substantial-evidence standard. *See* 8 U.S.C. § 1252(b)(4)(A)–(B); *Chenery*, 318 U.S. at 88 (analogizing to the principle that "the appellate court cannot take the place of the jury"). Only when an adjudicative fact is readily ascertainable can judicial or official notice be taken; otherwise, evidence and the procedural safeguards surrounding it are required. *See* Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.6 (7th ed. & Supp. 2025) (judicial notice and official notice); *see also id.* ch. 10 (judicial review of adjudicative fact finding); Fed. R. Evid. 201 (judicial notice of adjudicative fact).

In contrast, legislative facts "are ordinarily general facts not concerning the immediate parties." *Castillo-Villagra v. INS*, 972 F.2d 1017, 1026 (9th Cir. 1992). Evidentiary rules—whether the Federal Rules of Evidence for judicial proceedings or the Administrative Procedure Act's rules for administrative proceedings—"do not limit the kinds of materials a court or agency can use to resolve disputed issues of legislative fact." Hickman & Pierce, *Administrative Law Treatise*, *supra*, at § 9.5. Nor is recognition of legislative facts limited by deference to a specific fact-finder or a specific record. *Id.* (noting that a court may consult "multifarious ingredients that often defy identification and usually defy separation from other ingredients— knowledge of specific facts, understanding of general facts, prior experience in trying to solve similar problems, [and] scientific information"). As the Supreme Court

21

holds, a court "may ascertain as it sees fit any fact that is merely a ground for laying down a rule of law." *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 548 (1924).

Of course, there is sometimes wisdom in deferring to the views of a given agency, a given expert, or a given judge. *E.g.*, *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 245 (5th Cir. 1976) (Brown, C.J., concurring) (seeing benefit in allowing a specific agency's experts to address an issue, although noting that the court can decide that legislative fact); *United States v. Rodriguez-Gamboa*, 972 F.3d 1148, 1151 (9th Cir. 2020) (deferring to findings made after a trial judge hears evidence); *United States v. Phifer*, 909 F.3d 372, 376 (11th Cir. 2018) (remanding for the trial judge to consider the meaning of a term used in law, while recognizing that it "presents a question of law for the court to decide").

But that practice does not arise from any legal constraint. Appellate judges routinely interpret the scope of laws by ascertaining legislative facts using extra-record sources that they find persuasive and as they "see[] fit." *Chastleton*, 264 U.S. at 548. That is true for non-scientific facts. *E.g.*, *Caetano v. Massachusetts*, 577 U.S. 411, 419–20 (2016) (Alito, J., concurring) (noting extra-record facts about stun-gun popularity and use); *Duncan v. Bonta*, 19 F.4th 1087, 1168–69 (9th Cir. 2021) (Van-Dyke, J., dissenting) (explaining several facts about guns). That is true for scientific facts as well. *E.g.*, *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 581–82 (2013) (extensively discussing DNA characteristics); *Leary v. United*

*States*, 395 U.S. 6, 38–53 (1969) (consulting many extra-record sources to judge a marijuana law); *Chamu v. U.S. Attorney General*, 23 F.4th 1325, 1330–33 (11th Cir. 2022) (using organic-chemistry sources to find several legislative facts informing a law's meaning). Indeed, the Federal Circuit has an entire office of technical assistants to provide its judges with extra-record sources of scientific knowledge. 28 U.S.C. § 715(c)–(d).

In requesting remand, the government cites many cases about deferential review and remanding to find adjudicative facts. *E.g.*, *Brezilien v. Holder*, 569 F.3d 403, 413 (9th Cir. 2009) (alien's credibility); *Zhi v. Holder*, 751 F.3d 1088, 1091 (9th Cir. 2014) (adverse credibility finding); *Kotasz v. INS*, 31 F.3d 847, 851 (9th Cir. 1994) (nature of circumstances in Hungary); *Diaz-Reynoso v. Barr*, 968 F.3d 1070, 1089–90 (9th Cir. 2020) (nature of alien's treatment in Guatemala). But we are not dealing here with adjudicative facts.

The question of what is covered by a given term in law "amounts to a legislative fact." *United States v. Turner*, 47 F.4th 509, 525 (7th Cir. 2022) (existence of cocaine esters). Indeed, a key justification for the categorical approach—despite its shortcomings—is that tribunals need not adjudicate facts other than the content of a given person's conviction records. *See Mellouli*, 575 U.S. at 805. *But see Alejos-Perez v. Garland*, 93 F.4th 800, 809–17 (5th Cir. 2024) (Oldham, J., concurring)

23

(noting the "bewildering results" of deliberately ignoring what a criminal admitted to doing).

In interpreting state criminal law under the modified categorical approach, "only legal questions remain and these questions do not invoke the Board's expertise." *Flores-Lopez v. Holder*, 685 F.3d 857, 865 (9th Cir. 2012) (citation omitted). I would not saddle the Board with work that we can do just as well.

In resolving legislative facts, I do see the wisdom in appropriate research before settling ambiguous issues. But the Supreme Court's realistic-probability test strikes me as a good heuristic for what counts as ambiguity here. *See Duenas-Alvarez*, 549 U.S. at 193. And I simply see no issues of relevance here that are ambiguous. My consultation of legal and scientific sources leaves me comfortable in understanding the word "methamphetamine" as used in the relevant law. Confirming that view, petitioner has not pointed to *any* Arizona case treating a positional isomer of methamphetamine as being "methamphetamine" itself. I see no realistic probability that Arizona courts would treat the term that way, so I see no need to remand on this issue of legislative fact.

## 2. The necessary basis of petitioner's conviction

The BIA correctly applied the categorical approach. Petitioner does not dispute that he was convicted of possession of drug paraphernalia, in violation of Arizona Revised Statutes § 13-3415(A). As the BIA held, this Arizona statute is

overbroad but divisible by drug type. *Romero-Millan*, 46 F.4th at 1047 ("[W]e conclude that drug type is an element of the offense under § 13-3415. That statute is divisible as to drug type, so the BIA did not err in applying the modified categorical approach[.]").

Petitioner also does not dispute the veracity of the records of his conviction under that statute. Under the modified categorical approach, those records show that petitioner's conviction necessarily rested on proof of "methamphetamine" as opposed to other drugs. "Methamphetamine" is a federally controlled substance. 21 C.F.R. § 1308.12(d)(2).

Lastly, "methamphetamine" does not mean something broader under Arizona law than under federal law—or at the very least petitioner has not met his burden to show so. Petitioner wrongly argues that Arizona law defines positional isomers of methamphetamine as "types of methamphetamine" itself. That misreads Arizona law. A positional isomer of methamphetamine is defined as a "dangerous drug," not as "methamphetamine" itself.

Specifically, Arizona law defines "[d]angerous drug" as any of "the following by whatever official, common, usual, chemical or trade name designated." Ariz. Rev. Stat. § 13-3401(6). One subdivision covers any quantity "of the following substances and their . . . isomers, whether optical, positional or geometric . . . having a potential for abuse associated with a stimulant effect on the central nervous system."

*Id.* § 13-3401(6)(c). One of drugs listed there is "[m]ethamphetamine." *Id.* § 13-3401(6)(c)(xxxviii). As shown, the Arizona provision covering chemical isomers of methamphetamine defines the term "dangerous drug," not "methamphetamine." *Id.* § 13-3401(6)(c).

As petitioner's own expert explained, the name "methamphetamine" is "a contracted form of *N*-methylamphetamine," which is "an amphetamine derivative that has a single functional group (methyl) bonded to the amine nitrogen." As petitioner's expert correctly explained, "Methamphetamine exists as two enantiomers (optical isomers): *levo*-methamphetamine and *dextro*-methamphetamine." The National Institute of Standards and Technology recognizes the same thing. Methamphetamine is a substance that has the chemical formula $C_{10}H_{15}N$ and has the following chemical structure:

National Institute of Standards and Technology, NIST Chemistry Webbook, SRD 69, *Methamphetamine*, https://webbook.nist.gov/cgi/cbook.cgi?ID=C537462 (last visited Sept. 23, 2025). That definition embraces two substances that are optical isomers of each other—mirror-images in three-dimensional space—and bear the

26

prefixes *dextro* (d or -) and *levo* (l or +), named for the direction in which the isomer rotates polarized light. *Id.* (showing name of "(+)-Methamphetamine"); *see Pfizer, Inc. v. Ranbaxy Lab'ys Ltd.*, 457 F.3d 1284, 1286 (Fed. Cir. 2006) (on the naming of optical isomers). The two isomers can be present together in a mixture, but *dextro*-methamphetamine has a higher stimulant effect in humans. *Esposito v. United States*, No. 3:90-cr-00169, 1998 WL 709790, at *1 n.1, *3 (N.D.N.Y. Sept. 30, 1998) (discussing the mixture dl-methamphetamine and noting that the U.S. Sentencing Guidelines previously distinguished d-methamphetamine as more potent).

That is how Arizona courts understand methamphetamine: "methamphetamine consists of both "the 'D-' or 'L-' type of isomer." *State v. Pecina*, 908 P.2d 52, 56 (Ariz. Ct. App. 1995). And federal courts agree. "Methamphetamine itself is comprised of two optical isomers." *Aguirre-Zuniga v. Garland*, 37 F.4th 446, 453 (7th Cir. 2022); *see also United States v. Steward*, 105 F.3d 667, 1996 WL 738529, at *1 (9th Cir. 1996) (unpublished table decision) ("There are two types (isomers) of methamphetamine: L-methamphetamine and D-methamphetamine.").

None of those sources—petitioner's expert, the expert federal agency, or state or federal case law—define "methamphetamine" as anything other than the two optical isomers of the molecule noted above. Federal statutes also reflect as much. The original, statutory drug schedules cover "methamphetamine, *including*" its optical isomers but not its other isomers. 21 U.S.C. § 812 sched. II(c), III(a)(3) (emphasis

27

added). Those other isomers may qualify as federal controlled substances under their own common name or under the Federal Analogue Act. *Id.* §§ 802(32), 813. But they are not defined as "methamphetamine" in federal law either.

In contrast to federal law's use of the relationship term "including" to name the optical isomers *as* methamphetamine, Arizona law simply uses the conjunction "and" in a catch-all clause requiring a "dangerous drug" (not "methamphetamine") to have the described chemical relationship to a listed substance. *See Pecina*, 908 P.2d at 56 (holding that the "potential for abuse" modifier at the end of the relevant paragraph is a legislative declaration, not a requirement of pharmacological proof).

Like federal law, Arizona does not define all chemicals with an isomerism relationship to methamphetamine as themselves *being* methamphetamine. That is because some types of isomerism are broader than others and exist between different drugs. *Optical* isomers are mirror images of the same molecule, while *positional* isomers have functional groups in different locations. For instance, courts have recognized phentermine as a positional isomer of methamphetamine. *Ex parte Wilson*, 588 S.W.2d 905, 907 (Tex. Crim. App. 1979) (en banc); *Hudson v. La. State Racing Comm'n*, 505 So. 2d 135, 136 (La. Ct. App. 1987). Indeed, petitioner's own expert listed phentermine's chemical name (α,α-dimethylphenethylamine) as among the positional isomers of methamphetamine. *See* National Institute of Standards and Technology, NIST Chemistry Webbook, SRD 69, *Phentermine*,

28

https://webbook.nist.gov/cgi/cbook.cgi?ID=122-09-8 (last visited Sept. 23, 2025) (providing that chemical name and showing its structure). But phentermine is not methamphetamine. Hence, phentermine is listed separately as an Arizona "dangerous drug." Ariz. Rev. Stat. § 13-3401(6)(c)(lix).

Isomerism between two molecules does not mean that they have the same name or the same properties. *United States v. Kelly*, 874 F.3d 1037, 1044 n.4, 1045 (9th Cir. 2017). For example, *Kelly* noted that two different substances—ethylone and butylone—are positional isomers of each other. 874 F.3d at 1045. A more detailed discussion of the types of isomerism can be found in the Eleventh Circuit's opinions in *Chamu*, 23 F.4th at 1330–33, and *Phifer*, 909 F.3d at 376–79, and the sources cited therein. As the above shows, when functional groups move—as in positional isomerism but not in optical isomerism—the chemical name changes.

Simply put, petitioner wrongly equates "an isomer of methamphetamine" with "a type of methamphetamine." As petitioner's own expert agreed, "methamphetamine" means the two optical isomers of the *N*-methylamphetamine molecule. *Accord Aguirre-Zuniga*, 37 F.4th at 453. Positional isomers are not optical isomers. So nothing in Arizona law defines "methamphetamine" to include positional isomers of methamphetamine.

Based on the divisibility of Arizona's paraphernalia statute by drug type as held in *Romero-Millan* and on petitioner's *Shepard* documents, the drug element of

petitioner's conviction was correctly identified as "methamphetamine." That means the same thing under Arizona and federal law. His conviction thus creates deportability even on the narrowest view of Romanette i's sweep.

The most that can be said for petitioner's view of how Arizona law works is that one can imagine it—not that any Arizona statute or case recognizes it. In his view, someone could (1) commit a crime involving any of the non-optical isomers of methamphetamine that fall within the "dangerous drug" definition; (2) be charged with "methamphetamine" specifically instead of the name of that isomer (like phentermine); and (3) under Arizona criminal procedure, still be convicted for "methamphetamine" only upon proof of a non-optical isomer of methamphetamine.

Imagining possibilities is one thing. But the Supreme Court was clear in *Duenas-Alvarez* that a person challenging his conviction as overbroad bears the burden to point to some case, whether his or another's, showing a "realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition." 549 U.S. at 193. Even assuming that the deportability standard here is limited strictly to methamphetamine (*but see supra* Part II.A–B), petitioner has not pointed to any Arizona case convicting someone of a "methamphetamine" crime for anything other than the two optical isomers, d- and l-methamphetamine. Both optical isomers are federal CSA drugs.

In moving to remand, the government has lost the thread. It dwells on a side-show: whether positional isomers of methamphetamine exist. That is irrelevant. Petitioner was not charged with a positional isomer of methamphetamine. Nor was he charged with a skeletal or functional isomer of methamphetamine. *See* Ariz. Rev. Stat. § 13-3401(6)(c) (defining "dangerous drug" to cover "isomers" of the named substances); *Phifer*, 909 F.3d at 380 (noting types of isomerism). Petitioner was charged with "methamphetamine." If that triggers the need to remand in every case for an Immigration Judge to hear from organic-chemistry experts about positional, skeletal, and functional isomerism and find adjudicative facts that appellate courts cannot harmonize due to deferential substantial-error review and the record rule, the categorical approach has lost its claim to efficiency, fairness, and predictability.

The government also focuses on whether any positional isomers of methamphetamine in fact have a potential for abuse as a stimulant. But as petitioner notes, Arizona case law holds that the abuse-potential clause is simply a legislative determination about the listed "dangerous drugs," not a pharmacological limitation on the list. *Pecina*, 908 P.2d at 56 (citing *State v. Light*, 852 P.2d 1246, 1247 (Ariz. Ct. App. 1993)). Given that holding, pharmacological proof here could not help the government's case by narrowing the scope of the term "dangerous drug." (Certification to the Arizona Supreme Court could narrow that view of the law. But the government does not seek certification, and the BIA cannot award it.) Again, however, this is a

31

distraction because petitioner was not charged with phentermine or any other dangerous drug relating to methamphetamine by isomerism. He was charged with, and admitted to, conduct involving "methamphetamine."

So I am at a loss for why the government believes remand is necessary. Petitioner's theory of how he could have been convicted of a "methamphetamine" crime has no support in statutory definitions, scientific sources, his own expert's declaration, or any identified prosecution history. Under the categorical approach, we are supposed to analyze the realistic sweep of a given offense element. We are not supposed to simply imagine things.

I concur in the decision to remand only because this is the government's case to prosecute, and it seeks remand. But I see no good reason for ordering yet more resources to be spent continuing this already six-year-long removal proceeding when the petition for review can be dismissed now.